UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
TONI FIORE, JADE D'AMARIO, SEAN DUNN,
and JOSHUA DUNN on behalf of themselves and
all others similarly situated,

                                 Plaintiffs,

      - against -

THE UNIVERSITY OF TAMPA,

                               Defendant.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 20-CV-3744 (CS)

<u>Appearances</u>:

Philip L. Fraietta
Alec M. Leslie
Bursor & Fisher, P.A.
New York, New York

Sarah N. Westcot
Bursor & Fisher, P.A.
Miami, Florida
*Counsel for Plaintiffs*

Jonathan M. Kozak
Jackson Lewis P.C.
White Plains, New York

Felice B. Ekelman
Ryan C. Chapoteau
Jackson Lewis P.C.
New York, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

       Before the Court is Defendant's motion to dismiss the Amended Complaint under Rules

12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  (ECF No. 19.)  For the following

reasons, Defendant's motion is GRANTED in part and DENIED in part.

I.      **BACKGROUND**

For purposes of the motion, I accept as true the facts, but not the conclusions, set forth in Plaintiffs' Amended Complaint.  (ECF No. 16 ("AC" or "Amended Complaint").)

A.      **Facts**

This case concerns the transition from in-person to remote instruction at the University of Tampa ("UT") during the spring 2020 academic semester in response to the COVID-19 pandemic.  (AC ¶ 1.)  Plaintiffs Jade D'Amario of New York and Joshua Dunn of Connecticut ("Student Plaintiffs") were enrolled as full-time undergraduate students at UT during the spring 2020 semester.  (*Id.* ¶¶ 20, 23.)  Plaintiffs Toni Fiore of New York and Sean Dunn of Connecticut ("Parent Plaintiffs") are parents of full-time undergraduate students who were enrolled at UT during the spring 2020 semester.  (*Id.* ¶¶ 19, 22.)  Defendant UT is a private university located in Tampa, Florida.  (*Id.* ¶ 25.)

Undergraduate tuition at UT for the spring 2020 semester was approximately $14,401, and full-time undergraduate students were charged mandatory fees of approximately $2082.  (*Id.* ¶¶ 32-33.)  Parent Plaintiffs Fiore and Dunn paid UT approximately $11,205 and $12,500, respectively, for tuition, fees, meals, and housing on behalf of their respective children for the spring 2020 semester, (*id.* ¶¶ 19, 22), and Student Plaintiffs D'Amario and Dunn paid UT approximately $8,000 and $7,000, respectively, in tuition, fees, meals, and housing for the spring 2020 semester, (*id.* ¶¶ 20, 23).  The fees paid by Student Plaintiffs included a "mandatory Student Service Fee," which "[p]rovides support for a number of student services, programs and activities," as well as a "mandatory Student Government Fee," which "[p]rovides basic support to student government, student productions, publications and other student-sponsored

organizations." (*Id*. ¶ 63 (cleaned up).)  None of the named Plaintiffs have received a refund of tuition or mandatory fees for the spring 2020 semester.  (*Id*. ¶¶ 19-20, 22-23.)

Before paying tuition or registering for classes for the spring 2020 semester, the Student Plaintiffs each consulted Defendant's online Course Catalog and its online Course Schedule Search and Registration tool.  (*Id*. ¶¶ 3, 21, 24, 35.)  The Course Catalog, which detailed every course offered, only mentioned online instruction for two courses and had a search function that allowed students to search by "Method," with options including "General Classroom," "Hybrid," "Independent Study," "Internship," and "Online."  (*Id*. ¶ 4.)  UT's Course Schedule Search listed the "Delivery Mode" as "In-Person" for each of the courses for which the Student Plaintiffs registered for the spring 2020 semester.  (*Id*. ¶¶ 5-6.)  They also received course schedules and course-specific syllabi listing the on-campus building and room where each course was to be held.  (*Id.* ¶¶ 7-8.)  They allege that they registered for classes and paid tuition with the understanding – based on representations in some of these materials – that their courses would be taught in-person.  (*Id*. ¶¶ 21, 24, 35.)

UT's spring semester ran from January 21, 2020 through May 8, 2020.  (*Id*. ¶ 30.)  The last academic day before the school's Spring Break was March 6, 2020.  (*Id*. ¶ 38.)  During Spring Break, on March 11, 2020, UT announced that all classes would move to online and remote instruction in response to the COVID-19 pandemic.  (*Id*. ¶ 36.)  On March 17, 2020, UT announced that the rest of the spring semester would be remote, with courses conducted online. (*Id.* ¶ 37.)

### B.   __Procedural History__

Plaintiff Fiore filed suit on May 14, 2020,[1] bringing claims on behalf of herself and a class of similarly situated persons for breach of contract (Count I), unjust enrichment (Count II), and conversion (Count III), seeking a pro-rated return of tuition and fees paid for the spring 2020 semester.  (ECF No. 1.)  Defendant requested a pre-motion conference on July 31, (ECF No. 6), and on August 26, the Court held the pre-motion conference and granted Plaintiff leave to amend the complaint, (Minute Entry dated Aug. 26, 2020).  Plaintiffs amended their complaint on September 15, 2020, (AC), and the instant motion followed, (ECF No. 19).  Defendant moves to dismiss the claims of the Parent Plaintiffs for lack of standing under Rule 12(b)(1), and all claims for failure to state a claim on which relief can be granted under Rule 12(b)(6).  (ECF No. 20 ("D's Br.").)

Between December 2020 and March 2021, the parties made several supplemental submissions regarding COVID-19 tuition cases decided after briefing was complete.  (ECF Nos. 29, 30, 31, 32, 33, 34.)  On July 16, 2021, Defendant requested that the Court re-open briefing so that the parties could address Florida Statute § 768.39 (the "Florida Statute" or the "Statute"), which was signed into law on June 29, 2021.  (ECF No. 36.)  Defendant argues the Florida Statute immunizes it against Plaintiffs' claims and is grounds for dismissal of this case.  (*Id.*; ECF Nos. 38, 42.)  The Court granted the request, (ECF No. 37), and the parties submitted supplemental briefs, (ECF Nos. 38, 40, 42).  Plaintiffs' supplemental opposition challenges the constitutionality of the Florida Statute under the United States and Florida Constitutions.  (ECF No. 40.)  Plaintiffs provided notice of the constitutional challenge to the Attorney General of the

---

[1] Plaintiffs D'Amario, Sean Dunn, and Joshua Dunn were not named plaintiffs in the initial complaint, but were added in the Amended Complaint.  (*See* AC.)

State of Florida, as required under Federal Rule of Civil Procedure 5.1(a).  (ECF No. 41.)  The Court certified the constitutional challenge to the same official as required under 28 U.S.C. § 2403(b) and Federal Rule of Civil Procedure 5.1(b).  (ECF No. 43.)  More than sixty days have passed since the Plaintiffs filed notice of the constitutional challenge, and the Florida Attorney General has not intervened.[2]

## II.   LEGAL STANDARD

### A.   Motion to Dismiss for Lack of Standing

Under Rule 12(b)(1), a district court may properly dismiss an action for lack of subject matter jurisdiction "if the court lacks the statutory or constitutional power to adjudicate it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416-17 (2d Cir. 2015) (cleaned up).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In determining whether subject matter jurisdiction exists, a district court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (cleaned up), *aff'd*, 561 U.S. 247 (2010).  A court may also "rely on evidence outside the complaint" when deciding a Rule 12(b)(1) motion.  *Cortlandt St. Recovery Corp.*, 790 F.3d at 417.

Article III of the Constitution limits a federal court's jurisdiction to actual "Cases" and "Controversies."  U.S. Const. art. III, § 2; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560

---

[2] Rule 5.1(c) provides that "the attorney general may intervene within 60 days after the notice is filed or after the court certifies the challenge, whichever is earlier."  Fed. R. Civ. P. 5.1(c).

(1992).  "Constitutional standing is the threshold question in every federal case, determining the power of the court to entertain the suit."  *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 184 (2d Cir. 2001) (cleaned up).  That is, where a party lacks standing to bring a claim, the court lacks subject matter jurisdiction over that claim and must dismiss it.  *See SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020).

### B.      Motion to Dismiss for Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (cleaned up).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."  *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Id.*

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to

relief.'" *Id.* (cleaned up) (quoting Fed. R. Civ. P. 8(a)(2)).

> When deciding a motion to dismiss, a court is entitled to consider:
>
> (1) facts alleged in the complaint and documents attached to it or incorporated in
> it by reference, (2) documents integral to the complaint and relied upon in it, even
> if not attached or incorporated by reference, (3) documents or information
> contained in defendant's motion papers if plaintiff has knowledge or possession
> of the material and relied on it in framing the complaint . . . , and (5) facts of
> which judicial notice may properly be taken under Rule 201 of the Federal Rules
> of Evidence.

*Weiss v. Incorporated Village of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011)

(cleaned up).

### C.   <u>Choice of Law</u>

Both parties have cited Florida cases and relied on Florida law to argue the Rule 12(b)(6)

motion to dismiss the claims for breach of contract, unjust enrichment, and conversion.  Neither

party has disputed that Florida law governs this action.  Therefore, the Court infers that both

parties have consented to an application of Florida law to decide the substantive issues in this

motion.  *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) ("[T]he parties'

briefs assume that New York law controls this issue, and such implied consent is sufficient to

establish choice of law.") (cleaned up).  Of course, "standing in federal court is a question of

federal law, not state law."  *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013).

## III.   <u>DISCUSSION</u>

The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28

U.S.C. § 1332(d).

A.    **Florida Statute § 768.39**

As a threshold matter, the Court must consider the effect of the Florida Statute, which

became law while Defendant's motion was pending.

Subsection (1) of the Florida Statute sets out the legislature's findings:

The Legislature finds that during the COVID-19 public health emergency, educational institutions had little choice but to close or restrict access to their campuses in an effort to protect the health of their students, educators, staff, and communities. Despite these efforts, more than 120,000 cases of COVID-19 have been linked to colleges and universities nationwide, and the deaths of more than 100 college students have been attributed to the disease. The Legislature further finds that lawsuits against educational institutions based on their efforts to provide educational services while keeping students, faculty, staff, and communities safe during the COVID-19 public health emergency are without legal precedent. One court has even acknowledged that the "legal system is now feeling COVID-19's havoc with the current wave of class action lawsuits that seek tuition reimbursement related to forced online tutelage." Under these circumstances, the Legislature finds that there is an overpowering public necessity for, and no reasonable alternative to, providing educational institutions with liability protections against lawsuits seeking tuition or fee reimbursements or related damages resulting from the institutions changing the delivery of educational services, limiting access to facilities, or closing campuses during the COVID-19 public health emergency.

Fla. Stat. § 768.39(1). "Educational institution," as defined in the statute, includes both public

and nonpublic postsecondary institutions. *Id.* § 768.39(2).

Subsection (3)(a) of the Florida Statute immunizes any "educational institution that has

taken reasonably necessary actions in compliance with federal, state, or local guidance to

diminish the impact or the spread of COVID-19" from "any civil damages, equitable relief, or

other remedies relating to such actions." *Id.* § 768.39(3)(a). This provision sets out a non-

exclusive list of "reasonably necessary actions taken while a state of emergency was declared":

(1) "Shifting in-person instruction to online or remote instruction for any period of time;"

(2) "Closing or modifying the provision of facilities, other than housing or dining facilities, on

the campus of the educational institution;" or (3) "Pausing or modifying ancillary student

activities and services available through the educational institution." *Id.* The Statute deems "[t]he provision of in-person or on-campus education and related services" to have been "impossible" during any time in which educational institutions were responding to COVID-19, *id.* § 768.39(3)(b), and all reasonably necessary actions, as defined in subsection (3)(a), are "deemed justified" due to "the various governmental orders and the need for educational institutions to protect their communities," *id.* § 768.39(3)(c).

The Florida Statute also provides that "invoices, catalogs, and general publications of an educational institution are not evidence of an express or implied contract to provide in-person or on-campus education and related services or access to facilities during the COVID-19 public health emergency" in a suit against an educational institution. *Id.* § 768.39(4). The Statute also mandates a heightened burden of proof in COVID-19 tuition cases, providing that a plaintiff must present clear and convincing evidence that she is entitled to damages. *Id.* § 768.39(7).[3]

Defendant contends that, as an educational institution, subsection (3)(a) of the Florida Statute provides it with immunity from Plaintiffs' claims, and that even without that provision, Plaintiffs' claims are fatally undermined by other parts of the statute, including the evidentiary provision and the provision establishing a heightened burden of proof. Plaintiffs challenge the constitutionality of the Florida Statute, arguing that it unconstitutionally impairs the obligations of contract in violation of the U.S. and Florida Constitutions and violates the Access to Courts provision of the Florida Constitution. (ECF No. 40 at 1-6.) In addition, Plaintiffs challenge application of the law on the grounds that the relevant provisions were not intended to apply

---

[3] While not relevant here, "losses or damages that resulted solely from a breach of an express contractual provision allocating liability" or that were caused by a college or university's bad faith are exempted from the Florida Statute. *Id.* § 768.39(5).

retroactively to pending cases, or, alternatively, that such retroactive application would unconstitutionally impair Plaintiffs' vested rights.  (*Id.* at 6-10.)

The Court first assesses whether (and to what extent) the relevant provisions apply retroactively.  For a statute to apply retroactively under Florida law, the Court must determine first "whether there is clear evidence of legislative intent to apply the statute retrospectively." *Metropolitan Dade County v. Chase Fed. Hous. Corp.*, 737 So. 2d 494, 499 (Fla. 1999).  "If the legislation clearly expresses an intent that it apply retroactively, then the second inquiry is whether retroactive application is constitutionally permissible."  *Id.*

### 1.    Legislative Intent to Apply the Statute Retroactively

"It is a well established rule of statutory construction that, in the absence of an express legislative statement to the contrary, an enactment that affects substantive rights or creates new obligations or liabilities is presumed to apply prospectively."  *Hassen v. State Farm Mut. Auto. Ins. Co.*, 674 So. 2d 106, 108 (Fla. 1996).  But "the presumption against retroactivity is only a default rule of statutory construction" that can be "rebutted by clear evidence of legislative intent."  *Chase Fed. Hous. Corp.*, 737 So. 2d at 500.  To determine whether the legislature intended for the Statute to operate retroactively, the Court must consider "both the terms of the statute and the purpose of the enactment."  *Id.* at 500.

Defendant contends that "[i]t cannot be credibly disputed that the Florida Legislature intended the [Florida Statute] to apply to existing tuition and fees litigation against colleges and universities resulting from the impact of the COVID-19 pandemic."  (ECF No. 38 at 8.)  As evidence of this intent, Defendant points to the legislative finding that the "current wave" of lawsuits against universities and colleges related to those institutions' responses to COVID-19 is unprecedented.  Fla. Stat. § 768.39(1).  The legislature specifically singled out "class action

lawsuits that seek tuition reimbursement related to forced online tutelage." *Id.*  The legislature

further found "an overpowering public necessity" for the immunity protections granted to

educational institutions in the Florida Statute.  *Id.*  Defendant argues that dismissing this case is

the only way to give effect to this legislative intent.  (ECF No. 42 at 6.)  The sole alternative,

according to Defendant, would be a finding that the Statute applies purely prospectively, which

Defendant argues would be absurd because there have been no emergency health orders in effect

in Florida since the Statute became law.  (*Id.* at 6-7.)  Thus, according to Defendant, the Statute

would be pointless because it would apply only to conduct occurring after its enactment, but the

conduct it immunizes – "reasonably necessary actions taken while a state of emergency was

declared for this state," Fla. Stat. § 768.39(3) – occurred exclusively before its enactment.  (ECF

No. 42 at 6-7.)

Plaintiffs stress the absence of an explicit statement that the legislature intended the

Florida Statute to apply retroactively, and point to the fact that the legislature considered, but

failed to adopt, a retroactivity provision.  (ECF No. 40 at 7-8.)  An April 12, 2021 version of the

bill provided:

> This section shall apply retroactively to causes of actions accruing on or after
> March 1, 2020, the date of the declaration of the COVID-19 public health
> emergency by the State Surgeon General, and shall apply prospectively to causes
> of action that accrue before the end of the academic term during which the
> emergency declaration expires or is terminated.  However, this section does not
> apply in a civil action against a particular named defendant which is commenced
> before the effective date of this section.

H.B. 1261 (Committee Substitute 1), 2021 Leg., 123d Reg. Sess. (Fla. 2021).  The legislature

later struck this language, and this section of the bill became law without it.  *See generally* Fla.

Stat. § 768.39.

Defendant is correct that Plaintiffs misconstrue this legislative history.  Plaintiffs argue

that it shows that "the legislature contemplated the idea of protecting those universities that are

already being sued for improperly withholding student refunds, but specifically chose not to."
(ECF No. 40 at 8.)  But the legislature actually considered *not* protecting universities that had
already been sued, and chose not to.  The provision that was considered and rejected specifically
would not have immunized universities that had already been sued.  As drafted, the discarded
provision protected only universities that had not already been sued, so it being dropped could
suggest either that the statute was not intended to apply retroactively at all or that the legislature
intended to protect all institutions, whether or not they had already been sued.  I conclude it is the
latter, for the reasons that follow, but at the very least this drafting history does not support
Plaintiffs' theory.

  Plaintiffs correctly argue that the Florida Statute contains no express provision stating
that it is to apply retroactively, but the statutory text clearly demonstrates the legislature's
retroactive intent because it targets specific events and actions already complete at the time the
Statute was passed.  It addresses lawsuits brought in reaction to "institutions changing the
delivery of educational services, limiting access to facilities, or closing campuses during the
COVID-19 public health emergency," Fla. Stat. § 768.39(1), and purports to immunize
institutions from the consequences of "[r]easonably necessary actions taken while a state of
emergency was declared for this state for the COVID-19 pandemic," *id.* § 768.39(3)(a).  The
legislature also uses the past tense throughout the enacted Statute – for example, addressing the
problem of "educational institutions [that] *had* little choice but to close or restrict access to their
campuses," *id.* § 768.39(1) (emphasis added), by immunizing any college or university that "*has
taken* reasonably necessary actions" and deeming in-person instruction "to *have been* impossible
. . . during any period of time in which such institutions *took* reasonably necessary actions . . . to
protect students, staff, and educators in response to the COVID-19 public health emergency," *id.*

§ 768.39(3)(a), (b) (emphasis added).  These passages reflect an unmistakable intent to address the ramifications of past conduct.

These passages also highlight the implausibility that the legislature intended the Florida Statute to have no retroactive effect.  Were the Court to give the Statute that meaning, it would create the absurd result of having a law on the books that largely immunizes past conduct but has no retroactive effect.[4]  Courts are to avoid interpretations that would make legislation a nullity or lead to absurd results.  *See Wollard v. Lloyd's & Cos. of Lloyd's*, 439 So. 2d 217, 218-19 (Fla. 1983) ("It is a basic tenet of statutory construction that statutes will not be interpreted so as to yield an absurd result.").

Two possibilities remain:  either the legislature intended the statute to apply retroactively in all cases, or the legislature intended the statute to apply to past conduct so long as no action had been filed at the time the law was passed.  The latter possibility was considered by the legislature in the April 12, 2021 draft of the bill and rejected (as recounted above).[5]  No language

----

[4] Plaintiffs here, like those in most COVID lawsuits, address their clams only to the spring 2020 semester, when classes went online after they had begun.  Plaintiffs do not raise any claim regarding the fall 2020 or succeeding semesters, presumably because for those semesters they were aware that classes would or might be remote when they decided whether or not to register.  Because the lawsuits the Florida legislature wanted to block relate almost exclusively to events occurring more than a year earlier, the legislation must have been intended to apply retroactively.  Further, the Statute refers to events occurring during the declared state of emergency, but by the time of its enactment no emergency orders were in place.  *See* Fla. Exec. Order No. 21-102 (eliminating existing state emergency COVID-19 orders as of May 3, 2021); Fla. Exec. Order No. 21-101 (invalidating COVID-19 emergency orders enacted by local governments prior to July 1, 2021).

[5] That the legislature considered giving the statute this effect but decided against it is not, standing alone, clear evidence of legislative intent as to retroactive application.  *See Bay Farms Corp. v. Great Am. All. Ins. Co.*, 835 F. Supp. 2d 1227, 1240 (M.D. Fla. 2011) (finding that the deletion of language "expressly preclud[ing] the retroactive application" of an amendment "cannot be construed as clear evidence of legislative intent for retroactive application"); *see also Fla. Ins. Guar. Ass'n v. Devon Neighborhood Ass'n*, 67 So. 3d 187, 197 (Fla. 2011) ("[T]he *absence* of a statement in the act that the amendments are inapplicable to existing contracts does

that remains in the enacted statute draws a distinction between actions already commenced as of the date of enactment and actions commenced thereafter.  Moreover, subsection (1) suggests that the legislature is reacting to the "current wave" of class action litigation, and in doing so quotes one such case that was decided prior to enactment.  *See Salerno v. Fla. S. Coll.*, 488 F. Supp. 3d 1211, 1214 (M.D. Fla. 2020).  Thus, it is clear that the legislature intended the statute to apply retroactively, with no carve-out for already commenced cases, and I turn to the second inquiry under Florida law:  "whether retroactive application is constitutionally permissible."  *Chase Fed. Hous. Corp.*, 737 So. 2d at 499.

### 2.    Whether Retroactive Application is Constitutionally Permissible

"[E]ven where the Legislature has expressly stated that a statute will have retroactive application, this Court will reject such an application if the statute impairs a vested right, creates a new obligation, or imposes a new penalty."  *Menendez v. Progressive Exp. Ins. Co.*, 35 So. 3d 873, 877 (Fla. 2010); *see Chase Fed. Hous. Corp.*, 737 So. 2d at 503 ("[The] retroactive abolition of substantive vested rights is prohibited by constitutional due process considerations.").[6]  Conversely, a law that is "procedural or remedial in nature" may be constitutionally applied retroactively without implicating due process.  *Maronda Homes, Inc. of Fla. v. Lakeview Rsrv. Homeowners Ass'n*, 127 So. 3d 1258, 1272 (Fla. 2013).  The "inquiry is

---

not constitute clear evidence of retroactive intent.") (emphasis in original).  Rather, the text of the statute points to clear legislative intent, and the fact that the legislature considered and rejected the language at issue merely reinforces the logical reading of the statutory text.  *Cf. Acosta v. Loc. Union 26*, 895 F.3d 141, 144 (1st Cir. 2018) ("Few principles of statutory construction are more compelling than the proposition that [a legislature] does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.") (cleaned up).

[6] Likewise, courts must reject the retroactive application where such application would "impair[] the obligation of contracts."  *Menendez*, 35 So. 3d at 877 n.4.

whether retroactive application of the statute 'attaches new legal consequences to events completed before its enactment.'"  *Menendez*, 35 So. 3d at 877 (quoting *Chase Fed. Hous. Corp.*, 737 So. 2d at 499).

"Article I, section 2 of the Florida Constitution guarantees to all persons the right to acquire, possess, and protect property.  Section 9 of the same article provides that '[n]o person shall be deprived of life, liberty or property without due process of law.' Art. I, § 9, Fla. Const." *Am. Optical Corp. v. Spiewak*, 73 So. 3d 120, 125 (Fla. 2011).  A "plaintiff's right to commence an action is a valid and protected property interest" under Florida law, *Wiley v. Roof*, 641 So. 2d 66, 68 (Fla. 1994), and federal law, *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ("[A] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause.").  Thus, a common-law cause of action becomes a vested right, protected by the due process clauses of the U.S. Constitution and the Florida Constitution, "when the cause of action accrues."  *Williams v. Am. Optical Corp.*, 985 So. 2d 23, 30 (Fla. Dist. Ct. App. 2008), *aff'd sub nom. Am. Optical Corp. v. Spiewak*, 73 So. 3d 120 (Fla. 2011).  "A cause of action for breach of contract accrues at the time of the breach," *Woodward v. Morell*, 319 So. 3d 47, 53 (Fla. Dist. Ct. App. 2021) (cleaned up), and a cause of action for unjust enrichment or conversion "accrues when the last element constituting the cause of action occurs," *Cleveland Clinic Fla. v. Children's Cancer Caring Ctr., Inc.*, 274 So. 3d 1102, 1105 (Fla. Dist. Ct. App. 2019) (cleaned up) (unjust enrichment); *see Gomez v. BankUnited*, No. 10-CV-21707, 2011 WL 114066, at *5 (S.D. Fla. Jan. 13, 2011) (conversion).

Defendant argues that the Florida Statute does not impair vested rights because subsection (3)(a), which provides immunity, is remedial in nature, in that it operates as a "legislative interpretation" that was intended to clarify existing Florida law with regard to the

obligations of educational institutions during COVID-related closures.  (ECF No. 42 at 8-9.)
Defendant further contends that subsection (3)(a) "provid[es] a remedy for educational
institutions to employ against lawsuits for recovery of tuition and fees based on those
institutions' 'reasonably necessary' actions in response to the COVID-19 pandemic."  (*Id.* at 9.)[7]
I disagree.

Plaintiffs' causes of action accrued more than one year before the passage of the statute
when the alleged breach of contract, unjust enrichment, and conversion took place.  And this
lawsuit was filed on May 14, 2020 – also more than a year before the legislation was enacted.
The immunity provision in subsection (3)(a), if given retroactive effect, would impair and indeed
destroy Plaintiffs' ability to recover on their already-asserted claims.  Retroactive application of
the statute thus "would abolish actions that have accrued under the common law," which "would
offend due process."[8]  *Maronda Homes*, 127 So. 3d at 1275.  The Statute does not merely
"operate to further a remedy or confirm rights that already exist," but rather "adversely affects or
destroys a vested right," *id.* at 1272, and thus may not be applied retroactively.

Defendant further argues that even if the immunity provisions in subsection (3)(a) impair
a substantive vested right, the evidentiary provision in subsection (4) is procedural – and thus can
be constitutionally applied prospectively – because it "relates to the admissibility of evidence."
(*Id.* at 10.)  While phrased as merely an evidentiary change, subsection (4) is in effect a

---

[7] Defendant makes a similar argument with regard to subsections (3)(b) and (3)(c).  The
Court need not address the applicability of subsections (3)(b) and (3)(c) at this stage because
they deal with the viability of certain defenses that, even if applicable to excuse nonperformance,
would not necessarily preclude the possibility that Plaintiffs could recover damages in equity.
*See Rosado v. Barry Univ. Inc.*, 499 F. Supp. 3d 1152, 1159 (S.D. Fla. 2020).

[8] This principle applies to unfiled actions that have accrued as well as to pending
lawsuits.  *See Williams*, 985 So. 2d at 28 (amendment to tort immunity statute abolishing right to
recover could not validly be applied to accrued-but-not-yet filed or pending lawsuits).

16

substantive change to Florida law with regard to the documents that govern the relationship between a student and a university.  *See, e.g.*, *Gibson v. Lynn Univ., Inc.*, 504 F. Supp. 3d 1335, 1339 (S.D. Fla. 2020) ("It is generally accepted that the terms of that contractual relationship 'may be derived from university publications such as the student handbook and catalog.'") (quoting *Sirpal v. Univ. of Miami*, 509 F. App'x 924, 929 (11th Cir. 2013) (*per curiam*) (summary order)); *see also Williams*, 985 So. 2d at 30 ("Constitutionally, a new statute becoming effective after a cause of action has already accrued may not be applied to eliminate or curtail the cause of action."); *Chase Fed. Hous. Corp.*, 737 So. 2d at 500 n.9 (statute that "accomplishes a remedial purpose by creating new substantive rights or imposing new legal burdens" should be treated as substantive).  The change imposes a new burden on plaintiffs in a specific subset of cases to prove the terms of a contract without the use of documents that, prior to this statute, were accepted as a source of contractual obligations.  *See Gibson*, 504 F. Supp. 3d at 1339.  It thus cannot apply retroactively.[9]

Because the Florida Statute would violate due process by impairing Plaintiffs' vested rights in their causes of action, its retroactive application is impermissible and the Statute cannot

---

[9] Moreover, if – as Defendant argues – subsection (4) is merely procedural because it only implicates the "admissibility of evidence," (*see* ECF No. 42 at 10), under the *Erie* doctrine a federal court would not be bound by it, *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, (1938). Under *Erie* and its progeny, to determine whether state or federal law should apply to a given question, courts must look to whether there is a Federal Rule on point and "whether the state statute directly conflicts with the Federal Rule."  *Riley v. Roberts Bros. Coach Leasing Co.*, No. 09-CV-2157, 2010 WL 11626737, at *4 (M.D. Fla. Aug. 12, 2010) (citing *Hanna v. Plumer*, 380 U.S. 460, 471 (1965)).  If "there is a direct conflict, the analysis ends there and the Court must apply the Federal Rule."  *Id.*  "Under the Federal Rules of Evidence, all relevant evidence is admissible."  *United States v. Rendon*, 359 F. App'x 80, 81 (11th Cir. 2009) (summary order) (citing Fed. R. Evid. 402).  If Defendant is correct that subsection (4) is purely an evidentiary rule, then the question whether "invoices, catalogs, and general publications of an educational institution" are admissible would be governed in this Court by the Federal Rules, not Florida state law.

constitutionally be applied in this case to bar Plaintiffs' claims.[10]  *See Williams*, 985 So. 2d at 32.
Thus, the Court turns to Defendant's motion to dismiss for lack of standing and failure to state a
claim.

>  **B.**   **Standing**

Defendant moves to dismiss the Parent Plaintiffs' claims under Rule 12(b)(1) for lack of
standing.  There are three constitutional standing requirements that every plaintiff must satisfy in
order to invoke the jurisdiction of the federal courts:  (1) "an injury in fact (*i.e.*, a concrete and
particularized invasion of a legally protected interest)"; (2) "causation (*i.e.*, a fairly traceable
connection between the alleged injury in fact and the alleged conduct of the defendant)"; and
(3) "redressability (*i.e.*, it is likely and not merely speculative that the plaintiff's injury will be
remedied by the relief plaintiff seeks in bringing suit)."  *Sprint Commc'ns Co. v. APCC Servs.,
Inc.*, 554 U.S. 269, 273-74 (2008) (cleaned up).  The party invoking federal jurisdiction bears the
burden of establishing that it has standing to do so.  *Lujan*, 504 U.S. at 561.

The Parent Plaintiffs allege that on behalf of their children, they paid Defendant
approximately $11,205 and $12,500, respectively, for tuition, fees, meals, and housing for the
spring 2020 semester.  (AC ¶¶ 19, 22.)  Defendant argues that Parent Plaintiffs were not party to
any contractual agreement with UT, nor were they entitled to any of the benefits (such as
education or services) that were the subject of the relationship between the majority-age Student
Plaintiffs and UT.  (D's Br. at 6.)

---

[10] Because the Florida Statute cannot be applied based on my conclusion that its
retroactive application would improperly impair Plaintiffs' vested rights, I do not consider
whether retroactive application of the statute unconstitutionally impairs an obligation of contract
or address Plaintiffs' direct constitutional challenges to the statute under the U.S. and Florida
Constitutions.

Plaintiffs' theory is that the Parent Plaintiffs have suffered an economic loss because they would not have paid the same amount of tuition and fees on behalf of their children for online education.  (ECF No. 26 ("Ps' Opp.") at 4-5.)  In support Plaintiffs cite three state-law cases, none of which addressed standing, let alone Article III standing in federal court.  (*Id.* at 6.)[11] Plaintiffs point out that there is a "custom" that parents who have economic means pay for their children's higher education; that parents' income may be relevant to whether a student qualifies for financial aid; and that family law courts may require, as part of a separation or custody order, that a parent be required to pay tuition.  (*Id.* at 6-7.)  But they fail to explain why any of those facts demonstrate standing here.

The Court agrees with Defendant that the Parent Plaintiffs lack standing.  Other federal courts throughout the country have so held in COVID-19 tuition litigation.  *See, e.g.*, *Rynasko v. N.Y. Univ.*, No. 20-CV-3250, 2021 WL 1565614, at *3 (S.D.N.Y. Apr. 21, 2021), *appeal*

---

[11] In *Uddin v. New York Univ.*, 6 N.Y.S.3d 900, 900-01 (App. Term 2014), the court denied a motion to dismiss a parent's claim for a tuition refund because the university had not definitively established that the student withdrew, as opposing to being thrown out.  That the plaintiff was the parent rather than the student was not discussed.  In *Zumbrun v. Univ. of S. Cal.*, 25 Cal. App. 3d 1, 6 (Ct. App. 1972), the plaintiff was the student.  The court stated that "a minimal departure from a projected course of study does not entitle the student (or his parent who paid for it) to recover the tuition paid to any part of it."  *Id.* at 11 (citing *Paynter v. N.Y. Univ.*, 319 N.Y.S.2d 893, 893 (App. Term 1971)). The parenthetical portion of the quote (which is *dictum*) plainly arose from the citation to *Paynter*, in which the court held that the student's father was not entitled to a refund because classes has been suspended for a day.  *See* 319 N.Y.S.2d at 893-94.  That the plaintiff was the parent rather than the student was not discussed. In *Christensen v. S. Normal Sch.*, 790 So. 2d 252, 255 (Ala. 2001) (*per curiam*), the court noted, "Because a school and a student or the student's parents rarely use a formal, written contract, the general nature and terms of the contract between a school and the student or parents are usually implied."  But that case was brought by parents against a boarding school attended by their children when they were minors, *id.* at 253 & n.1, and the issue was whether the breach of contract, fraud and negligence claims were end-runs around the prohibition on education malpractice causes of action, *id.* at 253.  None of the cases cited by Plaintiff contain support for the proposition, let alone state, that parents of adult college students have standing under the federal Constitution.

*docketed*, No. 21-1333 (2d Cir. May 21, 2021); *Romankow v. N.Y. Univ.*, No. 20-CV-4616, 2021 WL 1565616, at *2-3 (S.D.N.Y. Apr. 21, 2021); *Metzner v. Quinnipiac Univ.*, No. 20-CV-784, 2021 WL 1146922, at *5 (D. Conn. Mar. 25, 2021); *In re Univ. of Miami COVID-19 Tuition & Fee Refund Litig.*, 524 F. Supp. 3d 1346, 1354-55 (S.D. Fla. 2021); *Espejo v. Cornell Univ.*, No. 20-CV-467, 2021 WL 810159, at *2 (N.D.N.Y. Mar. 3, 2021); *Gociman v. Loyola Univ. of Chicago*, No. 20-CV-3116, 2021 WL 243573, at *2 (N.D. Ill. Jan. 25, 2021); *Lindner v. Occidental Coll.*, No. 20-CV-8481, 2020 WL 7350212, at *5-6 (C.D. Cal. Dec. 11, 2020); *Salerno*, 488 F. Supp. 3d at 1216-17.  These courts have reasoned that parents cannot demonstrate that they have suffered any injury in fact traceable to the conduct of the educational institution defendants.  *See, e.g.*, *Metzner*, 2021 WL 1146922, at *5 ("[I]t is the student and not the parent that has suffered the alleged injury-in-fact that is traceable to the alleged actions of Quinnipiac for purposes of Article III."); *In re Univ. of Miami*, 524 F. Supp. 3d at 1355 (while parents "have a parental interest in their children's education, the education – and the relationship with the university – belongs to the student, not to the parent" and thus the parents fail to allege a concrete injury); *Salerno*, 488 F. Supp. 3d at 1216-17 ("[T]he lack of injury to [the parent plaintiff] is clear regardless of whether [the parent plaintiff] provided financial support to her daughter.  That arrangement was between mother and daughter.").

Here, as in other COVID-19 tuition cases where courts have found that parents do not have standing, Plaintiffs allege no direct contractual relationship between UT and the Parent Plaintiffs.  The alleged contractual relationship was strictly between the students and UT, and the benefits of the promises that Plaintiffs allege were breached are exclusively benefits that would flow to the students, not their parents.  (AC ¶¶ 21, 24, 43, 58-59, 61.)  The Parent Plaintiffs' involvement, as alleged in the Amended Complaint, begins and ends with the payment of tuition.

(*Id.* ¶¶ 19, 22.)  But the payment of tuition alone "does not create a contractual relationship between parents and a college." *Rynasko*, 2021 WL 1565614, at *3 (cleaned up); *see Metzner*, 2021 WL 1146922, at *4 ("[T]he fact that a parent pays tuition on behalf of his or her child does not confer standing on that parent to sue for breach of an obligation that the college or university owed the child.") (collecting cases).

Absent a direct contractual relationship, the fact that the Parent Plaintiffs paid tuition is insufficient unless Plaintiffs also plausibly allege that Parent Plaintiffs were intended third party beneficiaries of the contracts between Defendant and Student Plaintiffs.  *See Rynasko*, 2021 WL 1565614, at *3.  But this is plainly not the case; the sole beneficiaries of these contractual relationships – *i.e.*, the recipients of the education and services for which the parties contracted – are the students.  *See In re Univ. of Miami*, 524 F. Supp. 3d at 1354-55.  Plaintiffs argue that the parents' injuries were the "economic loss" caused by Defendant's change in instruction format. (Ps' Opp. at 4.)  But the "economic loss" to the parents in these cases is "traceable to the arrangement" between parent and child that the parent is to pay tuition, not to any relationship between university and parent.  *Rynasko*, 2021 WL 1565614, at *3; *see Romankow*, 2021 WL 1565616, at *3 (parent who paid daughter's NYU tuition, "not being an NYU student, has suffered no injury at the hands of NYU").  The Court finds these cases persuasive and concludes that the Parent Plaintiffs do not have standing to pursue their claims.[12]

---

[12] The Court is also unpersuaded by Plaintiffs' efforts to distinguish standing with regard to the parents' breach of contract claims from standing to bring the unjust enrichment and conversion claims.  As other courts considering similar claims have concluded, the above reasons to find that parents do not have standing apply with equal force to all three of the claims brought here.  *See, e.g.*, *Romankow*, 2021 WL 1565616, at *3 (parent of student lacks standing to bring breach of contract, unjust enrichment, and conversion claims for COVID-19 tuition reimbursement); *Salerno*, 488 F. Supp. 3d at 1215-17 (same).

For these reasons, Defendant's motion is GRANTED with respect to the standing of Parent Plaintiffs.

**C.**   **Breach of Contract**

"For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009).

Here, Plaintiffs allege that they agreed to pay tuition and fees to Defendant in exchange for Defendant's promise to provide in-person educational and other related services, and that the terms of this agreement were set forth in, among other places, publications that include Defendant's Spring Semester 2020 Course Catalog, Course Schedule Search tool, course-specific syllabi, and class schedules.  (AC ¶ 57.)  Plaintiffs allege that Defendant materially breached the contractual agreement by failing to provide in-person educational services and that such failure resulted in damages to Plaintiffs.  (*Id.* ¶¶ 62, 65-66.)  Plaintiffs also allege that they paid certain fees to Defendant and that Defendant failed to provide promised services in exchange.  (*Id.* ¶¶ 63-64.)

**1.**   **Existence of a Valid Contract**

Formation of a valid contract under Florida law requires "offer, acceptance, consideration, and sufficient specification of essential terms." *Jericho All-Weather Opportunity Fund, LP v. Pier Seventeen Marina & Yacht Club, LLC*, 207 So. 3d 938, 941 (Fla. Dist. Ct. App. 2016).  Defendant argues that Plaintiffs have failed to establish the existence of a valid contract with respect to in-person educational services.  Defendant argues that Plaintiffs improperly rely on promotional materials and university policies that do not contain any contractual promises. Rather, according to Defendant, the Court should look to the terms of UT's Financial

Responsibility Statement ("FRS"), (ECF No. 21 ("Gregory Decl.") Ex. A), signed by each

Student Plaintiff, (*id.* ¶ 6), which does not guarantee any specific mode or location of class

instruction and which Defendant argues constitutes the entirety of the relevant contractual

agreement between the parties.  Finally, Defendant contends that Plaintiffs have failed to identify

any contractual terms that would entitle them to a pro-rated refund of fees paid at the beginning

of the semester.

a.   <u>Promises to Plaintiff</u>

"Under Florida law, the legal relationship between a private university and a student is

solely contractual in character."  *Gibson*, 504 F. Supp. 3d at 1339.  And "[i]t is well-settled in

Florida that the terms of the relationship between a student and a university may be found in

university catalogs, student manuals, student handbooks, and other university policies and

procedures."  *In re Univ. of Miami*, 524 F. Supp. 3d at 1352 (cleaned up) (collecting cases).

Moreover, there is substantial authority in analogous cases applying Florida law that statements

in university publications, policies, and similar materials can be sufficient to plead the existence

of a valid contract for in-person instruction.  *See Salerno*, 488 F. Supp. 3d at 1217-18

("[Plaintiff] alleges that the College's publications clearly implied that courses would be

conducted in-person.  The College's materials also touted its many resources and facilities – all

of which were located on the campus thereby implying in-person participation.  These

allegations are sufficient at this early stage, especially because Florida law recognizes that the

college/student contract is typically implied in the College's publications."); *Gibson*, 504 F.

Supp. 3d at 1339-40 ("Throughout the Amended Complaint, Plaintiff cites to portions of [the

university's] publications and policies that suggest courses would be conducted in-person and

students would have access to campus facilities and activities. . . .  At this early stage of the case

23

– given that Florida law recognizes that the university/student contract may be implied in the university's publications – these factual allegations are sufficient to plead the existence of a valid contract for in-person education."); *In re Univ. of Miami*, 524 F. Supp. 3d at 1353-54 (denying motion to dismiss breach of contract claim where plaintiffs cited "publications, web pages, catalogs, and policies that support [their] claim of a contract for on-campus instruction and services"); *Rhodes v. Embry-Riddle Aeronautical Univ., Inc.*, 513 F. Supp. 3d 1350, 1357-59 (M.D. Fla. Jan. 14, 2021) (to the same effect); *Rosado*, 499 F. Supp. 3d at 1157-58 (to the same effect).  I agree with these courts that allegations of an implied contract that include specific references to university publications are "more than sufficient to survive a motion to dismiss." *Rhodes*, 513 F. Supp. at 1358.

Plaintiffs base their allegations here on exactly the sort of materials that have been found sufficient in other cases:  UT's Course Catalog, Course Schedule Search and Registration tool, syllabi, and course schedules.  (AC ¶ 2.)  The Amended Complaint includes screenshots of the Course Catalog depicting the option given to students to select courses given in a classroom setting as opposed to online, (*id.* ¶ 4), screenshots of the Course Schedule Search and Registration tool specifically indicating that the delivery mode of courses would be in-person, (*id.* ¶¶ 5),[13] and a screenshot of a course schedule indicating the physical classrooms in which the courses were going to be delivered, (*id.* ¶ 7).  Plaintiffs also allege that their course syllabi also reference the on-campus locations of their classes, (*id.* ¶ 8), and point to Defendant's promotional materials, which highlight the equipment and facilities available to students on campus, (*id.* ¶ 41).

---

[13] Plaintiffs allege that UT's the Course Schedule Search and Registration tool indicated that the delivery mode of every spring 2020 class for which the Student Plaintiffs registered would be in-person.  (AC ¶ 6.)

Defendant attacks some of these publications as purely informational (the Course Catalog), or as being individually insufficient to create a binding contract (a course syllabus). (D's Br. at 10-13.)  Defendant argues that other publications, such as the Course Schedule Search and Registration tool, are "red herrings" because they do not include specific statements promising in-person education in exchange for tuition.  (*Id.* at 10-11.)  But taken together, these materials are sufficient to allege an implied contract with the specific term that the classes in which the students enrolled would be held in person.  *See, e.g.*, *Salerno*, 488 F. Supp. 3d at 1218; *Rosado*, 499 F. Supp. 3d at 1157; *Gibson*, 504 F. Supp. 3d at 1339-40; *In re Univ. of Miami*, 524 F. Supp. 3d at 1352-54; *Rhodes*, 513 F. Supp. 3d at 1357-59.

b.    FRS

Defendant argues that this case is distinguishable from other COVID-19 tuition cases due to the FRS.[14]  It has five sections, captioned "Payment of Fees/Promise to Pay," "Billing Errors,"

_____

[14] Because the FRS is not mentioned in the Amended Complaint and Plaintiffs did not rely on it in framing their claims, it is not properly considered on a motion to dismiss. *See, e.g.*, *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  When matters outside the pleadings are presented on a motion under Rule 12(b)(6), as here, the motion to dismiss may be converted to a motion for summary judgment under Federal Rule of Civil Procedure 56.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  A court may exercise its discretion to convert "provided that the court gives 'sufficient notice to an opposing party and an opportunity for that party to respond.'"  *Mathie v. Dennison*, 381 F. App'x 26, 26 (2d Cir. 2010) (summary order) (quoting *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995)).  But "under certain circumstances, a court may convert a motion without giving explicit notice."  *Metrokane, Inc. v. Wine Enthusiast*, 185 F. Supp. 2d 321, 325 (S.D.N.Y. 2002).  "The essential inquiry is whether the [opposing party] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of reasonable opportunity to meet facts outside the pleadings." *Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999) (cleaned up); *see Villante v. Dep't of Corr.*, 786 F.2d 516, 521 (2d Cir. 1986); *Metrokane, Inc.*, 185 F. Supp. 2d at 325.  Here Plaintiffs were on notice that Defendant was relying on the FRS, did not object to my considering it, had the opportunity to address it in their opposition, and did so.  Therefore, as to the issue of the FRS only, I convert the motion to one for summary judgment.  *See Reliance Ins. Co. v. Polyvision Corp.*, 474 F.3d 54, 57 (2d Cir.) (conversion proper where opposing party aware that additional factual material was being considered and did not object), *certified question answered*, 9 N.Y.3d 52 (2007).

"Delinquent Account/Collection," "Communication," and "Entire Agreement."  (Gregory Decl.

Ex. A.)  The first paragraph of the first section provides:

> I understand that when I register for any class at The University of Tampa or
> receive any service from The University of Tampa, I accept full responsibility to
> pay all tuition, fees and other associated costs assessed as a result of my
> registration and/or receipt of services.  I further understand and agree that my
> registration and acceptance of these terms constitutes a promissory note
> agreement (i.e., a financial obligation in the form of an educational loan as
> defined by the U.S. Bankruptcy Code at 11 U.S.C. §523(a)(8)) in which The
> University of Tampa is providing me educational services, deferring some or all
> of my payment obligation for those services, and I promise to pay for all assessed
> tuition, fees and other associated costs by the published or assigned due date.

(*Id.* Ex. A at 2.)  The last section provides:

> This agreement supersedes all prior understandings, representations, negotiations
> and correspondence between the student and The University of Tampa,
> constitutes the entire agreement between the parties with respect to the matters
> described, and shall not be modified or affected by any course of dealing or
> course of performance.  This agreement may be modified by The University of
> Tampa, if the modification is signed by me.  Any modification is specifically
> limited to those policies and/or terms addressed in the modification.

(*Id.* Ex. A at 3.)  Defendant argues that because the FRS constitutes the entire agreement

between it and Plaintiffs, and includes no promise of in-person educational services, no contract

for such services can exist.

Plaintiffs contend that the FRS cannot constitute the full scope of their agreement with

Defendant because it lacks numerous essential terms.  The *In re Univ. of Miami* court, applying

Florida law, found an analogous argument persuasive.  *See* 524 F. Supp. 3d at 1353-54.  In that

case, the court concluded that a similar document was "not the entirety of the parties' agreement"

because "it does not address numerous material terms concerning the students' enrollment,

including the cost and amount of tuition and fees owed."  *Id.*

Defendant attempts to distinguish *In re Univ. of Miami* on the basis of the merger clause

in UT's FRS.  Under Florida law, "[a]lthough the existence of a merger clause does not *per se*

establish that the integration of the agreement is total, a merger clause is a highly persuasive statement that the parties intended the agreement to be totally integrated." *Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 53 (Fla. Dist. Ct. App. 2005) (cleaned up).  But "[a]n agreement must be sufficiently specific and mutually agreeable as to every essential element." *Grimsley v. Inverrary Resort Hotel, Ltd.*, 748 So. 2d 299, 301 (Fla. Dist. Ct. App. 1999) (cleaned up).  "The definition of 'essential term' varies widely according to the nature and complexity of each transaction and is evaluated on a case-by-case basis." *Frayman v. Douglas Elliman Realty, LLC*, 515 F. Supp. 3d 1262, 1289 (S.D. Fla. 2021) (cleaned up).

The merger clause in the FRS does not purport to integrate the entirety of the contractual agreement between students and UT; rather, it is limited to the "matters described," which are registration for classes constituting the student's commitment to pay tuition, refunds if the student withdraws from classes, billing errors, collection of delinquent accounts, and billing-related communications.  (Gregory Decl. Ex. A.)  Nor could the FRS properly integrate the entirety of the agreement, because it is missing essential terms including the nature of the educational services UT is to provide and the amount of tuition and fees owed.  *Cf. Jones Boat Yard, Inc. v. M/V CAPELLA C*, No. 06-CV-21203, 2006 WL 3664405, at *6 (S.D. Fla. Nov. 17, 2006) (despite integration clause, contract was at most partially integrated because of its lack of specificity regarding pricing and scope of work); *see also* Restatement (Second) of Contracts § 209(3) (1981) (describing integrated agreement as "a writing which in view of its completeness and specificity reasonably appears to be a complete agreement").

Contrary to Defendant's argument, *In re Univ. of Miami* is instructive even in the face of the merger clause here.  There, the court held that the absence of essential terms rendered the FRS "not a contract" and merely "relevant to the formation of the alleged contract."  *In re Univ.*

*of Miami*, 524 F. Supp. 3d at 1354.  Thus, the primary failing of the agreement in *In re Univ. of Miami* was not the lack of a merger clause but the lack of essential terms, such as amount of tuition and fees owed.  That failing is equally present in the UT FRS.

Defendant has identified several recent cases where courts upheld FRS-equivalent agreements as unambiguous.  *See Chong v. Ne. Univ.*, 494 F. Supp. 3d 24, 28 (D. Mass. 2020); *Horrigan v. E. Mich. Univ.*, No. 20-75, 2020 WL 6733786, at *4 (Mich. Ct. Cl. Sep. 24, 2020); *Zwiker v. Lake Superior State Univ.*, No. 20-70, 2020 WL 8572097, at *4 (Mich. Ct. Cl. Aug. 31, 2020).  In *Chong*, decided under Massachusetts law, the court noted that it could not consider materials such as course descriptions because the plaintiffs (unlike Plaintiffs here) had not pleaded that such materials comprised part of the contract, and found that the Financial Responsibility Agreement alone did not specify any particular method of instruction.  *See* 494 F. Supp. 3d at 28.  But in a later ruling, on a motion to dismiss a further amended complaint, the court found it plausible that a reasonable student could have construed such materials, in conjunction with the signed agreement, to promise in-person instruction.  *Chong v. Ne. Univ.*, No. 20-CV-10844, 2020 WL 7338499, at *3 (D. Mass. Dec. 14, 2020).[15]  And, while *Zwiker* and *Horrigan* (both decided by the same judge) held that the language in the respective agreements was unambiguous under Michigan law, these cases did not apply Florida law and neither addressed whether the tuition agreement was missing essential terms.  *Horrigan*, 2020 WL 6733786, at *4; *Zwiker*, 2020 WL 8572097, at *4.  On this point, the Court finds *In re Univ. of Miami* to be more persuasive as a statement of Florida law.

---

[15] The *Chong* court later granted summary judgment to the university based on a disclaimer in its handbooks explicitly reserving the right to change or cancel its academic offerings and disclaiming liability for failure to deliver educational services based on causes beyond its control.  *See Chong v. Ne. Univ.*, No. CV 20-10844, 2021 WL 1857341, at *5 (D. Mass. May 10, 2021).

Because the FRS lacks numerous essential terms, the Court finds, at this early stage and on this limited record, that it is plausibly not the entirety of the parties' agreement such that it prohibits consideration of promises contained in university catalogs, handbooks, and university policies and procedures.  *See In re Univ. of Miami*, 524 F. Supp. 3d at 1353-54.

### 2.    Material Breach

Defendant argues that Plaintiffs' breach of contract claims should be dismissed because Plaintiffs have failed to allege a material breach.  Defendant argues that by providing instruction and academic credit to Plaintiffs and advancing them toward their degrees, Defendant performed the essence of the contract.  (D's Br. at 15-16.)

This argument has been explicitly rejected by courts applying Florida law.  The court in *Rosado* likened the switch from in-person to online instruction to "purchasing a Cadillac at full price and receiving an Oldsmobile.  Although both are fine vehicles, surely it is no consolation to the Cadillac buyer that the 'Olds' can also go from Point A to Point B."  499 F. Supp. 3d at 1158.  And in the words of the *Rhodes* court:

> Following Defendant's logic, a theatergoer who paid to see Hamilton on Broadway would suffer no damages if the theater shut down, kept his money, and allowed him to watch a recording of Hamilton on Disney+.  The two experiences are simply not the same and, therefore, have different values.  Neither the theatergoer nor Plaintiff should be required to accept less than what they bargained for.

513 F. Supp. 3d at 1358.  No citation – except perhaps to *Iqbal*'s reference to "judicial experience and common sense," 556 U.S. at 679 – is necessary for the proposition that an in-person college experience is radically different, and in many ways substantially less rich, than an online one.  Plaintiffs have plausibly alleged a contract for in-person educational services.  While online instruction may ultimately provide the same advancement toward a degree, it is not that for which Plaintiffs allege they bargained.

Further, while Defendant is correct that a breach must "go to the essence of the contract" in order to be material, *MDS (Can.), Inc. v. RAD Source Techs., Inc.*, 720 F.3d 833, 849 (11th Cir. 2013), Plaintiffs have pleaded that they would not have paid as much in tuition and fees had they known that their classes would not be in person, (AC ¶¶ 2, 21, 24, 35), which plausibly supports their allegation that Defendant's breach was material, (*id.* ¶ 62); *see Mabry Corp. v. Dobry*, 141 So. 2d 335, 338 (Fla. Dist. Ct. App. 1962) (breach of covenant material where contract would not have been made with that covenant omitted).

### 3.    Actionable Damages

Defendant further argues that Plaintiffs' breach of contract claims must fail because (1) Plaintiffs suffered no actual harm as a result of Defendant's switch to online instruction, and (2) the damages alleged are not ascertainable.  Defendant's first argument fails for the same reasons as its argument regarding material breach.  Plaintiffs have plausibly alleged a contract for in-person educational services which were not provided, and the Court is not persuaded by Defendant's assertions that degree advancement was the only benefit of the bargain.  *See, e.g.*, *Rosado*, 499 F. Supp. 3d at 1158; *Rhodes*, 513 F. Supp. 3d at 1358.

Defendant's second argument characterizes the alleged damages as speculative and subjective.  (D's Br. at 17-18.)  But Plaintiffs point to objective metrics on which they base statements about the value of in-person as opposed to online education – specifically, alleging that they paid a premium to attend in-person classes at UT as opposed to paying a lower price to attend online courses elsewhere.  (AC ¶ 43.)  Plaintiffs enumerate several in-person experiences for which they allegedly bargained and which Defendant touted, (*see id.* ¶¶ 39-41, 43), and seek a pro-rated return of tuition for the difference in value between a semester that included these

experiences and one that did not.[16]  This is sufficient because, at the pleading stage, "such allegations are enough to draw reasonable inferences that the alleged breach was not trivial and that damages flowed from the breach."  *Gibson*, 504 F. Supp. 3d at 1342; *see In re Univ. of Miami*, 524 F. Supp. 3d at 1353-54; *Chong*, 2020 WL 7338499, at *2 n.1; *Rosado*, 499 F. Supp. 3d at 1157.[17]

### 4.   Ratification

Finally, Defendant argues that Plaintiffs' breach of contract claims must be dismissed because Plaintiffs ratified any alleged breach by continuing with their classes following the switch to online instruction.  Defendant asserts that "Plaintiffs could have withdrawn or declared breach of such material term in March 2020 (when the transition took place) and demanded that any prior paid tuition and fees be refunded due to the University's alleged breach."  (D's Br. at 18.)

---

[16] Defendant at times implies that Plaintiffs are seeking a full refund of their tuition and fees for March 6, 2020 onward, (*see* D's Br. at 1, 4; ECF No. 28 at 1, 10-11), and while some language in the Amended Complaint could be read that way, (*see, e.g.*, AC ¶ 18 (seeking "disgorgement of the pro-rated portion of tuition and fees, proportionate to the amount of time that remained in the Spring Semester 2020 when classes moved online and campus services ceased being provided")), it appears to the Court that Plaintiffs are seeking the difference in value between the in-person experience for which they alleged they bargained and the online experience they got, (*see, e.g., id.* ¶ 66 (seeking "pro-rated portion of any Spring Semester 2020 tuition and fees for education services not provided since UT has not held in-person classes since March 6, 2020")).  Plaintiffs do not allege that they did not receive online instruction and advancement toward their degrees, so the Court cannot imagine a scenario in which they would be entitled to a 100% refund.

[17] While Defendant argues that cases like *Rosado* and *Gibson* are distinguishable because the universities in those cases offered online classes "at a predetermined, lower fee" than their in-person course offerings, (ECF No. 28 at 4 & n.2), this distinction does not make the damages here unascertainable or warrant dismissal of Plaintiffs' claims at this stage.  It is plausible that – perhaps through comparisons to peer institutions and/or expert testimony – Plaintiffs will be able to provide a basis to assess the value of UT's online classes relative to its in-person ones.

As a general matter, "[r]atification occurs where a party with full knowledge of all the material facts makes an affirmative showing of his or her express or implied intention to adopt an act or contract entered into without authority." *Zurstrassen v. Stonier*, 786 So. 2d 65, 71 (Fla. Dist. Ct. App. 2001). Here, UT's refund policy – to which Defendant points as part of the parties' contractual agreement – provides that Plaintiffs would have been ineligible for a refund had they elected to withdraw in March 2020 because, as the parties agree, UT's withdrawal period had passed. (*See* D's Br. at 9; Ps' Opp. at 22.) As other courts applying Florida law have held, a student's decision not to quit school and forfeit her tuition mid-semester, during a pandemic, is insufficient at this stage to affirmatively establish intent to adopt and ratify the alleged breach of contract. *See Gibson*, 504 F. Supp. 3d at 1343 (declining to "draw the conclusion that Plaintiff relinquished his contractual remedies solely based on allegations that he did not – in the face of an unpredictable, novel, and rapidly evolving pandemic – quit school mid-semester and risk forfeiting his tuition"); *Rosado*, 499 F. Supp. 3d at 1159 ("The pleading alleges that [Plaintiff] was forced to leave campus and that a withdrawal request at the time of the campus closure would have triggered the forfeiture of her tuition and a significant academic penalty. [Plaintiff's] decision to avoid that outcome, dictated by an unpredictable viral outbreak, without more, is insufficient at this juncture to establish an 'affirmative showing' of her 'intention to adopt' [the university's] alleged breach of contract.") (quoting *Zurstrassen*, 786 So. 2d at 71). Accordingly, Defendant at this stage has not established ratification.

For the above-stated reasons, Defendant's motion to dismiss is DENIED with respect to Plaintiffs' tuition-based breach of contract claims.[18]

---

[18] The Court stresses, as other courts have in this context, that it expresses no opinion on the merits of Plaintiffs' breach of contract claims and merely holds that the claim is sufficiently pleaded to survive the motion to dismiss. *See, e.g.*, *Salerno*, 488 F. Supp. 3d at 1218.

5.      **Fees**

Defendant also argues, with respect to Plaintiffs' claims for a return of pro-rated fees, that

Plaintiffs have failed to allege terms in Defendant's Tuition and Fee Schedule promising to

provide specific services that were not delivered once programming shifted online.  On this

issue, at this stage, the Court agrees with Defendant.  Student Plaintiffs allege that they each paid

a "mandatory Student Service Fee," which "provides support for a number of student services,

programs and activities," as well as a "mandatory Student Government Fee," which "provides

basic support to student government, student productions, publications and other student-

sponsored organizations."  (AC ¶¶ 20, 23, 63 (cleaned up).)  Plaintiffs allege that these fees were

"specifically intended to cover access to programs, facilities, activities, computing labs, and access to

on-campus events, all of which Plaintiffs and Class Members could no longer partake in."  (*Id.* ¶¶ 20,

23.)  But they have not provided facts supporting that conclusion or otherwise explained where that

intent was manifested.  The plain language of each fee description states that the fees go toward

the "support" of programs, not "access," and Plaintiffs have not alleged that the programs were

not supported.  While tuition monies are paid in exchange for a university *providing* instruction,

here Plaintiffs have alleged that the fees were paid in exchange for Defendant *supporting*

programs.  *See Chong*, 2020 WL 7338499, at *3-4.

If it were plausible that these fees provided physical access to specific programs or

activities that were unavailable after the change to online classes, *see id.* at *4 (dismissing as to

fees that "support" activities or facilities but permitting claim to go forward where fee allowed

students to access particular facilities or resources, such as fitness facilities and sporting events),

or that the fees collected to support various activities were not in fact used for that purpose, the

outcome might be different.  While it is plausible that after March 11, 2020, students could not,

for example, visit the library or computer lab or obtain in-person treatment at student health

services, the generic description of the fees that Plaintiffs provide does not suggest that the contested fees in fact went toward maintaining access to those facilities, nor do Plaintiffs allege that those facilities did not provide services to students while they were learning remotely.  And while it is plausible that students could not, for example, participate in live theater or club sports, there is no allegation that during the relevant period the fees did not go toward supporting other student activities that could continue during the pandemic, such as student government, online publications, tutoring, political groups, or filmmaking.  *See Crawford v. Presidents & Dirs. of Georgetown Coll.*, No. 20-CV-1539, 2021 WL 1840410, at *12 (D.D.C. May 7, 2021) (dismissing fee claim where plaintiffs did "not contend that the online portion of the semester was completely devoid of virtual activities").  But Plaintiffs may be able to provide facts rendering it plausible that the fees were intended specifically for access to facilities that became unavailable or that the fees were not in fact used to support remaining ongoing student activities and programs.  I will therefore let Plaintiffs amend their complaint in this respect.

For now, Plaintiffs have failed to allege with adequate specificity that fees intended to support certain programs were tied to access to on-campus facilities or in-person activities and were not used for such purposes.  Plaintiffs have only shown that fees were supposed to support student services and student activities, and Plaintiffs have not alleged that such programs were not supported.  Defendant's motion is therefore GRANTED with respect to Plaintiffs' fee-based breach of contract claims, but with leave to amend.

**D.**     **Unjust Enrichment**

Defendant's first argument with respect to Plaintiffs' unjust enrichment claim is that the claim may not be pleaded in the alternative, in this case because the allegations incorporated into Plaintiffs' claim allege that there is a contract governing the matter and thus a legal remedy.

(D's Br. at 20-22.)  Defendant points out that Plaintiffs agree that the nature of their relationship

with Defendant is contractual, that the nature of the relationship between a student and a

university is contractual under Florida law, and that Plaintiffs have not pleaded the lack of an

adequate remedy at law.  (*Id.*).

Defendant is correct that an unjust enrichment claim cannot survive when an express

contract with a legal remedy exists.  *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1322-23

(S.D. Fla. 2014).  But Plaintiffs' allegations of a contract for in-person educational services are

not equivalent to the undisputed existence of such a contract.  *See Martorella v. Deutsche Bank*

*Nat. Tr. Co.*, 931 F. Supp. 2d 1218, 1228 (S.D. Fla. 2013) ("[I]t is not upon the allegation of the

existence of a contract, but upon a showing that an express contract exists that the unjust

enrichment count fails.").  When a party disputes the alleged contract, as Defendant here disputes

the existence of a contract for in-person educational services, unjust enrichment may be pleaded

in the alternative.  *See, e.g.*, *Gibson*, 504 F. Supp. 3d at 1344 ("[A]n undisputed express or

implied-in-fact contract has yet to be established at this stage in the proceedings – and, therefore,

dismissal of Plaintiff's unjust enrichment claim is not warranted."); *id.* (denying dismissal of

unjust enrichment claim where Defendant "vehemently disputes the existence of a contract for

in-person education"); *Salerno*, 488 F. Supp. 3d at 1218 ("Regardless of whether a contract

exists, the College disputes the merits of the breach of contract claim."); *In re Univ. of Miami*,

524 F. Supp. 3d at 1354 ("[A]t this stage, Plaintiffs are entitled to plead alternative theories of

relief.").

Defendant's second argument is that Plaintiffs have failed to plausibly allege the

necessary elements of an unjust enrichment claim.  Those elements under Florida law are that

"'(1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2)

defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff.'"  *Rosado*, 499 F. Supp. 3d at 1159 (quoting *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. Dist. Ct. App. 2018)).  It is undisputed that Plaintiffs conferred a benefit on Defendant, in the form of tuition payments, and that Defendant accepted and retained that benefit.  Defendant argues, however, that Plaintiffs have not plausibly alleged circumstances such that it would be inequitable for Defendant to retain the tuition monies.  (D's Br. at 22.)

The essence of Defendant's argument is that Student Plaintiffs received a "different" but equally valuable educational experience in the second half of the spring 2020 semester, and therefore Defendant cannot have been unjustly enriched.  (*Id.* at 23-24.)  Whether this is the case requires a more developed record, but at this stage Plaintiffs have satisfied their burden by pleading facts – including that because online students cannot access campus facilities and faculty, online education is worth less than in-person education, (*see* AC ¶ 43) – that plausibly suggest that it could be inequitable for Defendant to retain the full tuition paid for the spring 2020 semester, *see Rhodes*, 513 F. Supp. 3d at 1360 ("[E]ven if Plaintiff received a substantial benefit from his payments of tuition and fees, it may still be inequitable for Defendant to retain their full value.  Because this is a question of fact, the matter cannot be decided on a motion to dismiss."); *see also Gibson*, 504 F. Supp. 3d at 1344 (plaintiff plausibly pleaded it would inequitable for college to retain full tuition and fees that were intended at least in part for services not provided); *Rosado*, 499 F. Supp. 3d at 1160 ("Although [the university] disputes that the retention of the payments was 'unjust,' a motion to dismiss tests the sufficiency of the pleading, not the merits of the case.  The Court further concludes that [Plaintiff] has properly

[pleaded] unjust enrichment as an alternative to her claim for breach of contract."). Because dismissal of the tuition-based unjust enrichment claims would be premature, Defendant's motion is DENIED with respect to these claims.

Finally, Defendant argues that Plaintiffs have failed to sufficiently allege unjust enrichment with respect to the fees paid by Plaintiffs for the spring 2020 semester. The Court agrees. As explained above, Plaintiffs have only alleged that the fees were meant to support programs that Defendant offered. Absent nonconclusory allegations that the fees did not go toward their intended purpose, Plaintiffs have not adequately pleaded circumstances in which it would be inequitable for Defendant to retain such fees.

For the foregoing reasons, Defendant's motion to dismiss is GRANTED with respect to fee-based unjust enrichment claims, but with leave to amend.

### E.   Conversion

"Under Florida law, conversion is an intentional tort consisting of an unauthorized act which deprives another of his property, permanently or for an indefinite time." *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1143 (M.D. Fla. 2007). The elements of a conversion claim under Florida law are "(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein." *Salerno*, 488 F. Supp. 3d at 1218 (cleaned up). But not everything that might be considered "property" can be subject to a conversion claim. "[I]n Florida a claim for conversion is appropriate where the defendant has wrongfully taken personal property or an intangible interest in a business venture." *Physicians Healthsource, Inc. v. Dr. Diabetic Supply, LLC*, No. 12-CV-22330, 2013 WL 12064482, at *5 (S.D. Fla. May 23, 2013) (cleaned up). In-person learning is "intangible and not the proper subject of a conversion claim" under Florida law. *Salerno*, 488 F. Supp. 3d at 1218. Similarly,

under Florida law it is a "general rule that an obligation to pay money cannot be enforced through an action for conversion."  *Bel-Bel Int'l Corp. v. Cmty. Bank of Homestead*, 162 F.3d 1101, 1109 (11th Cir. 1998).

Plaintiffs' Amended Complaint suggests that the property in question is Plaintiffs' "ownership right to the in-person educational services they were supposed to be provided in exchange for their Spring Semester 2020 tuition and fee payments to Defendant."  (AC ¶ 77.) This attempt to plead around the requirement that the subject of the conversion be property is undermined by the fact that Plaintiffs go on to allege that "Defendant's retention of the fees paid by Plaintiffs . . . deprived Plaintiffs . . . of the benefits for which the tuition and fees paid," and ask for the return of a pro-rated portion of the semester's tuition.  (*Id.* ¶¶ 80-81.)  It is plain that the property of which Plaintiffs claim to have been deprived is the money they paid for an in-person education, not the in-person education itself.  Indeed, it is hard to see how Defendant exercised dominion over the education.  Accordingly, this claim fails.

Plaintiffs argue that they fall under an "exception" to the general rule that a monetary obligation cannot form the basis for a conversion action, *Bel-Bel Int'l Corp.*, 162 F.3d at 1109, because their demand for a pro-rated portion of tuition money is a "fund capable of separate identification."  (Ps' Opp. at 29-30.)  This exception refers to a property right in money that is separately identifiable in the sense that a particular source for it was specified.  *See Bel-Bel Int'l Corp.*, 162 F.3d at 1108-09.  In *Bel-Bel Int'l Corp.*, for example, the property at issue was the receivables from the sale of certain tomato crops which had been pledged as security for a loan. *See id.* at 1104.  Plaintiffs' claim that this exception applies is conclusory and fails to engage with the nature of the exception discussed in *Bel-Bel*.  Plaintiffs do not seek to recover a pro-

rated share of the specific funds they paid for the spring 2020 semester, nor would those funds be separately identifiable.

Defendant's motion to dismiss the conversion claims is GRANTED.

**F.      Leave to Amend**

Leave to amend a complaint should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons.  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  "Amendment is futile when the problem with a plaintiff's causes of action is substantive and better pleading will not cure it."  *Trombetta v. Novocin*, 414 F. Supp. 3d 625, 634 (S.D.N.Y. 2019) (cleaned up).  "[I]t is within the sound discretion of the district court to grant or deny leave to amend."  *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (cleaned up).

Amendment of the conversion claim would be futile, but amendment of the breach of contract and unjust enrichment claims as they relate to student fees may not be.  Plaintiffs have already had a chance to amend, after Defendant's pre-motion letter gave notice of the grounds for the intended motion, and in general a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first.  Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*.") (cleaned up).  But the grounds set forth

in the pre-motion letter, and the discussion at the pre-motion conference, did not differentiate between Plaintiffs' payment of tuition and of fees, and that distinction turns out to be consequential. Accordingly, in my discretion I will permit Plaintiffs to amend their allegations as to the student fees only, if they can do so in good faith. Should Plaintiffs wish to do so, the Second Amended Complaint ("SAC") shall be filed no later than November 3, 2021, and Defendant shall respond in the ordinary course. If Plaintiffs do not file a SAC by that date, Defendant shall answer the AC no later than November 17, 2021.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss is GRANTED with respect to the standing of Parent Plaintiffs, Plaintiffs' fee-based breach of contract claim, Plaintiffs' fee-based unjust enrichment claim, and Plaintiffs' conversion claim, and DENIED with respect to Plaintiffs' tuition-based breach of contract claim and Plaintiffs' tuition-based unjust enrichment claim. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 19).

**SO ORDERED.**

Dated:  October 20, 2021
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.